# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# LYNCHBURG DIVISION

| | |
|---|---|
| PATRICIA H. WALDREN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 6:13-CV-53 |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Patricia H. Waldren ("Waldren") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Specifically, Waldren alleges that this case should be remanded to the Commissioner for consideration of new evidence presented to the Appeals Council after the Administrative Law Judge ("ALJ") denied her claim. I conclude that the new evidence is not material and thus does not warrant remand of this case under sentence four of 42 U.S.C. § 405(g). Accordingly, I **RECOMMEND DENYING** Waldren's Motion for Summary Judgment (Dkt. No. 9), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 11.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Waldren failed to demonstrate that she was disabled

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

1

under the Act.[2] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Waldren filed for SSI on October 20, 2010, claiming that her disability began on August 31, 2010. R. 433. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 351–80. On March 22, 2012, ALJ Marc Mates held a hearing to consider Waldren's disability claim. R. 319–49. Waldren was represented by an attorney at the hearing, which included testimony from Waldren and vocational expert AsheleyWells. R. 319–49.

On June 15, 2012, the ALJ entered his decision analyzing Waldren's claim under the familiar five-step process, and denying Waldren's claim for benefits.[3] R. 301–12. The ALJ

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent engaging in any and all forms of substantial gainful employment given the claimant's age, education, and work experience. See 42 U.S.C. §1382c(a)(3)(B).

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

2

found that Waldren suffered from the severe impairments of degenerative disk disease and knee difficulty, status-post bilateral knee replacement. R. 303. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 303. The ALJ determined that Waldren retained the residual functional capacity ("RFC") to perform light work, but is limited to no more than occasional pushing and pulling with her right leg; no more than frequent pushing and pulling with her left leg; cannot climb ladders/ropes/scaffolds; cannot crawl; and must avoid concentrated exposure to extreme cold, wetness, vibration and hazards. R. 304.

Given the above RFC, the ALJ determined that Waldren could return to her past relevant work as a tax preparer, fast food worker, printing machine operator and crimping machine operator (R. 310), and that Waldren could also work at other jobs that exist in significant numbers in the national economy such as housekeeper, cafeteria attendant and assembler. R. 311. Thus, the ALJ concluded that she was not disabled. R. 312.

Waldren appealed the ALJ's decision, and submitted additional medical records to the Appeals Council for consideration. R. 8–297. On September 5, 2013, the Appeals Council denied Waldren's request for review (R. 1–7), and this appeal followed.

## ANALYSIS

This case presents the single issue of whether additional evidence submitted by Waldren to the Appeals Council is new and material and warrants remand of the case under sentence four of 42 U.S.C. § 405(g). After the ALJ's denial decision, Waldren submitted to the Appeals Council medical records dating from June 25, 2012 through July 2, 2013. R. 8–297. The Appeals Council considered the additional information and made it part of the record, but "found

3

that this information does not provide a basis for changing the Administrative Law Judge's decision." R. 2.

Waldren first argues that the Appeals Council failed to perform its legal duty to substantively review the additional medical evidence on the record. When deciding whether to grant review, the Appeals Council must consider additional evidence, "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 95–96 (4th Cir. 1991). Evidence is new if it is not duplicative or cumulative. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Id. The Appeals Council is not, however, required to provide express, specific findings on the record regarding the additional evidence submitted by Waldren. As the Fourth Circuit clarified in Meyer v. Astrue, 662 F.3d 700, 705 (4th Cir. 2011), "nothing in the Social Security Act or the regulations promulgated pursuant to it requires that the Appeals Council explain its rationale for denying review." In this case, the Appeals Council's consideration of the additional evidence submitted by Waldren and denial of review met its obligations under the agency's regulations.

When the Appeals Council denied Waldren's request for review, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981. As such, this court must "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [Commissioner's] findings." Wilkins, 953 F.2d at 96. "However, the Fourth Circuit has also admonished that it is the role of the ALJ, and not reviewing courts, to resolve conflicts in the evidence." Davis v. Barnhart, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005) (citing Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996)). Thus, when faced with new evidence, a court must reconcile its duty under Wilkins to review the entire

4

record, including the new evidence, to determine if there is a reasonable possibility that it would change the outcome, with its obligation under Smith to abstain from making credibility determinations and resolving factual conflicts. Davis, 392 F. Supp. 2d at 751.

Courts in this district have achieved that balance by reviewing the record as a whole to determine if the new evidence is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports. If the new evidence creates such a conflict, there is a reasonable possibility that it would change the outcome of the case, and the case must be remanded to the Commissioner to weigh and resolve the conflicting evidence. If such conflicts are not present, the case can be decided on the existing record without a remand. Id. (citing Bryant v. Barnhart, No. 6:04cv000017, 2005 WL 1804423, *5 (W.D. Va. Jan 21, 2005); Smallwood v. Barnhart, No. 7:03cv00749, slip op. at 2 (W.D. Va. Oct. 19, 2004); Ridings v. Apfel, 76 F. Supp. 2d 707, 709 n. 6 (W.D. Va. 1999); Thomas v. Commissioner, 24 F. App'x 158, 162, 2001 WL 1602103, at *4 (4th Cir. 2001)(unpublished opinion); McConnell v. Colvin, No. 2:02cv00005, 2013 WL 1197091, at *7 (W.D. Va. March 25, 2013)). After a careful review of the additional medical evidence and the record as a whole, I find that the additional records do not constitute material evidence, and thus it is not appropriate to remand this case to the Commissioner to consider the evidence under sentence four of 42 U.S.C. § 405(g).

During the relevant period, Waldren sought treatment for chronic back pain, upper and lower extremity radicular pain, and knee problems. Waldren began experiencing consistent bilateral knee pain in 2010, and was prescribed a treatment regimen that evolved over time from physical therapy to cortisone injections, and eventually to bilateral total knee replacements in 2011. The focus in this case is on Waldren's recovery from those total knee replacements and her functional capacity post-surgery. The ALJ reviewed the evidence of record and determined

that Waldren's knee pain improved post-surgery to the extent that she could perform the range of light work set forth in the RFC. Waldren argues that medical records dated after the ALJ's decision demonstrate that her left knee replacement began failing prior to the ALJ's decision, causing her severe pain and limiting her functional capacity. The relevant evidence is set forth below.[4]

Waldren sought treatment for bilateral knee pain in December 2010, and was eventually diagnosed with degenerative joint disease and osteoarthritis in both knees. R. 596–97, 698–99. On January 18, 2011, state agency physician Thomas M. Phillips, M.D., reviewed the evidence and determined that Waldren was capable of performing medium work. R. 353–57. On June 10, 2011, state agency physician John Sadler, M.D., reviewed the evidence and found Waldren capable of lifting twenty pounds occasionally and ten pounds frequently, standing and walking for two hours and sitting for six hours in an eight-hour workday, and engaging in frequent pushing and pulling with her left lower extremity and occasional pushing and pulling with her right lower extremity. He further found that Waldren could not climb ladders, ropes or scaffolds, could not crawl, and needed to avoid concentrated exposure to extreme cold, wetness, vibration, and hazards. R. 363–67.

On July 15, 2011, Waldren's treating orthopedist, Ashley McCowen, M.D., completed a work note stating "[p]atient's permitted activity is walking or standing only occasionally, occasional lifting of 10 pounds maximum and occasionally lifting and/or carrying articles like small tools." R. 641. Dr. McCowen also noted that Waldren would need to frequently change positions. R. 641.

---

[4] Waldren's medical records address multiple medical issues, including her degenerative disc disease. Because this appeal focuses solely on Waldren's recovery from bilateral knee replacements, my opinion addresses only those records or portions of records relating to Waldren's knee complaints.

6

On July 25, 2011, Waldren underwent a total left knee replacement. R. 690. That same day, Waldren's orthopedic surgeon, W.C. Andrews, M.D., completed a physical limitations assessment and found that Waldren's ability to lift, carry, stand, walk and sit were all affected by her impairments. R. 638–40. Dr. Andrews noted that Waldren can never perform postural activities such as stooping, climbing, crouching, etc, and can only occasionally reach in all directions. He concluded that Waldren was totally disabled from any work activity, and noted that Waldren had a total knee replacement the same day. R. 640.

On November 14, 2011, Waldren underwent a total right knee replacement. R. 687–88. A month later, Waldren visited Dr. McCowen, complaining of continuing pain in her back and knees. R. 743. Waldren noted that her right knee was doing better than her left knee after surgery, but was still quite painful. R. 743. Dr. McCowen noted that Waldren had an antalgic gait, grossly intact strength, and used a single point cane. R. 743.

On December 23, 2011, Waldren visited pain management specialist Akhtar Purvez, M.D., and stated that her pain was under control while using Cymbalta. R. 824. On exam, Dr. Purvez found that Waldren had a normal gait, station and posture, and normal strength and tone in her bilateral lower extremities. R. 825. Dr. Purvez also noted that Waldren used a cane to walk, and her gait was hesitant in view of her recent right total knee replacement. R. 826.

On December 30, 2011, Waldren followed up with Dr. Andrews, who noted that Waldren's right knee was "doing well." R. 742. He also stated that a "snafu" occurred with Waldren's physical therapy prescription, causing her to be out of physical therapy for a few weeks. He noted that Waldren can flex past 90 degrees, and should keep working on her home exercise plan. R. 742.

7

On February 10, 2012, Waldren visited Dr. McCowen, and reported that her right knee was doing better than her left, and that she did not feel that she got the therapy she needed after her left knee replacement surgery. R. 730. On exam, Dr. McCowen noted full range of motion in Waldren's knees, full strength in her bilateral lower extremities, and negative seated straight leg raise bilaterally. R. 731.

On April 6, 2012, Waldren visited Dr. Andrews, complaining of pain in both knees. R. 710. Dr. Andrews found that Waldren had good motion and stability in both knees. Dr. Andrews noted that Waldren was doing well after participating in physical therapy for her bilateral total knee replacements, and instructed Waldren to continue her home knee exercise program. Dr. Andrews also performed x-rays of Waldren's knees, and found that they were in good position, with no sign of loosening or other abnormalities, aside from a lucency anteriorily in both proximal tibias that he would "keep an eye on." R. 714. Dr. Andrews stated that Waldren was doing "very well," and both of her knees are improving "a lot." R. 713.

On April 27, 2012, Dr. Andrews noted a prepatellar cyst or bursal deformity on Waldren's right knee, with significant tenderness, erythema and drainage, but concluded that it was likely a postoperative change. He did not feel that anything needed to be done. R. 709.

Based upon these records, the ALJ concluded that Waldren was capable of performing a range of light work. R. 304–12. The ALJ considered the medical opinions in the record, but noted that the opinions of Dr. McCowen and the state agency physicians were rendered prior to Waldren's total knee replacements, and that Dr. Andrews' opinion was given the same day as Waldren's total left knee replacement. R. 310. The ALJ gave these assessments limited weight because they addressed Waldren's abilities at a specific point in time, and the records reflected that her knee problems improved after the surgeries. R. 310. The ALJ specifically noted multiple

8

post-surgery records reflecting that Waldren had full muscle strength in her lower extremities, normal gait, and negative seated straight leg raise. R. 309.

Waldren submitted additional medical records to the Appeals Council reflecting treatment she received after the ALJ's June 15, 2012 decision. Waldren contends that this subsequent treatment demonstrates that Waldren's left total knee replacement failed, requiring Waldren to undergo an additional surgery on her left knee in June 2013. Waldren asserts that these additional records relate back to the relevant period because they demonstrate that she suffered severe, chronic knee pain after her knee replacements, which contradicts the ALJ's conclusion that Waldren's knee pain improved post-surgery.

On July 26, 2012, Waldren saw Dr. Andrews, complaining of "a lot of pain diffusely throughout both knees." R. 255. Waldren walked with a cane but denied any instability, catching or locking in her knees. R. 255. Waldren's knees were tender, had mild effusion, no swelling, normal alignment, no crepitation, and could flex 120 degrees. R. 256–57. Dr. Andrews ordered a bone scan, which showed the "expected defects of bilateral knee replacements." The scan also showed slightly asymmetric increased activity in the medial left tibial component, with uncertain significance. R. 248.

On August 10, 2012, Waldren followed up with Dr. Andrews, again complaining of "recently" increased pain in her knees bilaterally. R. 278. Dr. Andrews concluded that Waldren needed additional surgery to clean out the left knee and determine the cause of her pain. R. 278.

Almost nine months later, on April 3, 2013, Waldren visited Quanjun Cui, M.D. with University of Virginia Orthopedics to evaluate her knee pain. R. 137–40. Dr. Cui noted that Waldren had suffered from bilateral knee pain for many years before and after her total knee replacements, with more pain in her right knee than left. R. 137. Waldren reported that she felt

9

good for a few months after surgery and then her knee started hurting. R. 137. Waldren complained of pain and instability, despite treatment with pain medication, physical therapy, and use of a cane. R. 137. Dr. Cui ordered x-rays of Waldren's knees, which showed loosening of the tibial tray on the left side, and possible femoral component loosening on the right side. R. 149. On May 9, 2013, Dr. Cui determined that Waldren needed additional surgery on her left knee. R. 95.

On May 10, 2013, Dr. Cui completed a medical source statement, finding that Waldren could "maybe" lift up to forty pounds, stand and walk less than two hours, sit up to six hours or more, and occasionally perform postural activities. R. 92. Dr. Cui concluded that Waldren was disabled from substantial work activity, noting that her left total knee replacement failed and needs surgery as soon as possible. R. 92. Dr. Cui also checked boxes indicating that Waldren's medical condition would cause significant pain that interrupts her activities and/ or concentration and requires unpredictable and/or lengthy periods of rest during the day. R. 92.

On July 2, 2013, Waldren underwent surgery to revise her previous left total knee replacement. R. 13. The discharge summary indicates that Waldren "did well initially" after her total knee replacements, and then subsequently experienced pain and instability in both knees.

The Commissioner concedes that the records submitted to the Appeals Council constitute "new" evidence. Comm'r Br. at 3. They were created after the ALJ's decision, and are not duplicative or cumulative of other evidence in the record. Both parties agree that the determinative issue in this case is whether those new records relate back to the relevant period, or instead reflect a subsequent deterioration in Waldren's left knee that occurred after the ALJ's decision.

"An implicit materiality requirement is that the new evidence relates to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or the subsequent deterioration of the previous non-disabling condition." Cameron v. Astrue, No. 7:10-cv-58, 2011 WL 2945817, at *8 (W.D. Va. July 21, 2011) (citing Szuback v. Sec'y, Dep't Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984)). Here, the new records reflect that Waldren continued to seek treatment for her knee pain, and eventually required an additional surgery on her left knee. Indeed, within two months of the ALJ's decision, Dr. Andrews' office notes reflect increased pain in Waldren's knees, and the need for an additional surgery on her left knee. R. 278. However, there is nothing in Dr. Andrews' post-decision records that relate the deterioration in Waldren's knees back to June 2012. Likewise, Dr. Cui's records contain no indication that Waldren's knee conditions deteriorated prior to the ALJ's decision. Rather, Dr. Cui's May 10, 2013 assessment clearly reflects Waldren's functional capacity at a specific moment in time—nine months after the ALJ's decision, and prior to Waldren's second surgery on her left knee. R. 92. There is no attempt by Dr. Cui to relate his opinion back to the relevant time period.

Counsel for Waldren does not dispute that substantial evidence exists to support the ALJ's decision without consideration of this new evidence. It would require pure conjecture by the court to conclude that these new records relate to Waldren's functional capacity prior to the ALJ's decision. The new evidence simply demonstrates that Waldren's condition worsened shortly after the ALJ's decision. In situations where a claimant's health worsens after the ALJ's decision, either due to a progressive condition or a stable condition with a sudden decline, the proper recourse is to file a new application. Consequently, I find that remand is not warranted under sentence four of 42 U.S.C. § 405(g).

11

## **CONCLUSION**

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter: November 18, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge